2013-1357

# United States Court of Appeals

### for the

## Federal Circuit

ARLINGTON INDUSTRIES, INC.,

*Plaintiff-Appellee,*

*v.*

BRIDGEPORT FITTINGS, INC.,

*Defendant-Appellant.*

*Appeal from the United States District Court for the Middle District of Pennsylvania in case no. 02-CV-0134, Judge A. Richard Caputo.*

## BRIEF OF PLAINTIFF-APPELLEE
## ARLINGTON INDUSTRIES, INC.

KATHRYN L. CLUNE
COUNSEL OF RECORD
AMIR D. KATZ
CROWELL & MORING LLP
1001 Pennsylvania
Avenue, NW
Washington, DC 20004
(202) 624-2500

JACOB Z. ZAMBRZYCKI
CROWELL & MORING LLP
275 Battery St.
23rd Floor
San Francisco, CA 94111
(415) 986-2800

CARTER G. PHILLIPS
RACHEL H. TOWNSEND
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

*Counsel for Plaintiff-Appellee Arlington Industries, Inc.*

October 28, 2013

## CERTIFICATE OF INTEREST

Counsel for Appellee Arlington Industries, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

        Arlington Industries, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

        Arlington Industries, Inc.

3.     All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by me are:

        None

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Crowell & Moring LLP:  Kathryn L. Clune, Lucy Grace Noyola, Michael I. Coe, Vincent J. Galluzzo, Jacob Z. Zambrzycki, Scott L. Bittman, Amir D. Katz

Dorsey & Whitney, LLP:   Alan Baron, Christopher S. Casieri, Rori-Elizabeth Sinks

Greenberg Traurig, LLP:   Mark L. Hogge, Laura M. Klaus, Timothy C. Bass, Shailendra Maheshwari, Katie A. Jefcoat

The Jackson Patent Group:  Auzville Jackson, Jr.

Kaufman & Canoles:  Stephen Noona, Kristen B. Burch

Rhoads & Sinon LLP:  Robert J. Tribeck, Thomas A. French, David M. Barasch

Sidley Austin LLP:  Carter G. Phillips, Eric A. Shumsky, Rachel H. Townsend

Wormuth, Mey & Sulla, LLP:  Michael R. Mey

October 28, 2013                    Respectfully submitted,


                                     /s/ Kathryn L. Clune
                                    KATHRYN L. CLUNE
                                    *COUNSEL OF RECORD*
                                    CROWELL & MORING LLP
                                    1001 Pennsylvania Avenue, NW
                                    Washington, DC 20004
                                    (202) 624-2500 (Telephone)
                                    (202) 628-5116 (Facsimile)
                                    kclune@crowell.com

                                    *Counsel for Arlington Industries, Inc.*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ........................................................................i

TABLE OF AUTHORITIES ..........................................................................vi

TABLE OF ABBREVIATIONS .......................................................................x

STATEMENT OF RELATED CASES .................................................................1

JURISDICTIONAL STATEMENT ...................................................................3

STATEMENT OF ISSUES ..............................................................................3

INTRODUCTION AND STATEMENT OF THE CASE...........................................5

STATEMENT OF FACTS ...............................................................................8

I.      Arlington Revolutionized the Electrical Connector Industry......................8

II.     Bridgeport's Two Decades of Copying .......................................................10

III.    The Contempt Proceeding ........................................................................13

        A. Dr. Rahn's Testimony Regarding Colorable Imitation and
           Infringement .......................................................................................13

             1.  "Leading End External Cylindrical Surface" ...........................14

             1.  "Surrounding Said Leading End Cylindrical Surface" ............19

        B. Bridgeport's Testimony Regarding Its Connectors' Functional
           Equivalence.........................................................................................20

        C. Bridgeport's Advertisements Touted Arlington's Patented Features
           but Were Silent on Purported Modifications................................20

        D. Evidence of Bridgeport's Direct and Indirect Infringement .........21

        E. The District Court's Claim Construction ....................................21

             1.  "Cylindrical"........................................................................21

             2.  "Surrounding".........................................................................22

        F. Bridgeport's Patents.............................................................................22

        G. The District Court's Contempt Order .......................................22

SUMMARY OF THE ARGUMENT ................................................................24

ARGUMENT ............................................................................................25

I.      Standard of Review.....................................................................................25

II.    This Court Lacks Jurisdiction Over Bridgeport's Appeal from an Interlocutory Contempt Order. ........................................................27

    A.    The District Court's Contempt Order Was An Interpretation Not A Modification of the Prior Injunction............................................28

    B.    There is No Jurisdiction Under 28 U.S.C. § 1292(c)(2) Because a Contempt Proceeding With Unquantified Sanctions Is Not "Final Except for an Accounting." ....................................................31

III.    The District Court Properly Found Bridgeport in Contempt for Violation of the '488 Injunction. .....................................................33

    A.    A Contempt Proceeding Was Appropriate. ....................................34

    B.    Bridgeport's Modification of the "External Cylindrical Surface" from a Stepped Shape to a Sloped Shape Was Insignificant in Form, Application and Function. ............................................36

        1.    The Court Correctly Identified the Connectors' "External Cylindrical Surface" as Part of its *TiVo* Analysis. ...................................36

        2.    The District Court Heard Ample Evidence That the Accused Connectors' "External Cylindrical Surface" Was a Colorable Imitation...........................................41

        3.    Designing Around Non-Patented Features..............................50

    C.    The District Court Did Not Clearly Err In Finding That Bridgeport Made Only An Insignificant Modification To How The Adapter "Surround[s]."..........................................53

    D.    Arlington Presented Undisputed Evidence That Bridgeport Marketed Both the Enjoined and Accused Connectors as Functional Equivalents to Arlington's Products..........................................53

    E.    Bridgeport's "Patents" are Irrelevant. ..........................................57

IV.    The Court Correctly Construed the Claims ..................................58

    A.    "Cylindrical".................................................................................58

        1.    The Ordinary Meaning of "Cylindrical" Is Not Limited to a Perfect Cylinder ....................................................59

        2.    The Specification Supports the District Court's Construction and Contradicts Bridgeport's .........................................60

        3.    The District Court's Construction Is Consistent with Bridgeport's Previous Admission of Infringement ..................................65

    4.   The Court Did Not Base Its Construction on Its Previous
        Construction of the '831 Patent ............................................... 67

    5.   The District Court's Construction Does Not Render Other Claim
        Terms Superfluous ................................................................... 68

  B.  "Surrounding" ................................................................................. 71

    1.   The Previous Construction of "Cylindrical" Has Preclusive Effect ........ 71

    2.   The Intrinsic Evidence Supports the District Court's Construction
        and Contradicts Bridgeport's ................................................... 75

V.     The Findings of Direct and Indirect Infringement Should Be Affirmed ....... 77

VI.    Bridgeport's Challenge to the Scope of the Injunction Is Misplaced
       and Its Argument Regarding Lost Profits Demonstrates the
       Prematurity of This Appeal ......................................................... 81

CONCLUSION ................................................................................ 83

CERTIFICATE OF SERVICE ............................................................ 85

CERTIFICATE OF COMPLIANCE ..................................................... 86

# TABLE OF AUTHORITIES

Page(s)

CASES

*Abbott Laboratories v. Torpharm, Inc.*,
  503 F.3d 1372 (Fed. Cir. 2007) ...........................................................26

*Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.*,
  154 F.3d 1345 (Fed. Cir. 1998) .............................................. 29, 35, 65

*Aevoe Corp. v. AE Tech Co.*,
  727 F.3d 1375 (Fed. Cir. 2013) ...................................................... 27, 28

*Alexander v. United States*,
  201 U.S. 117 (1906) ........................................................................ 27, 31

*American Board of Surgery v. Lasko*,
  2013 WL 3826696 (3d Cir. 2013) ................................................... 28, 31

*Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*,
  340 F.3d 1298 (Fed. Cir. 2003) ...........................................................71

*Anderson v. Bessemer City*,
  470 U.S. 564 (1985) ...............................................................................26

*Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*,
  290 F. Supp. 2d 508 (M.D. Pa. 2003) ...........................................1, 71

*Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*,
  692 F. Supp. 2d 487 (M.D. Pa. 2010) .................................................35

*Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*,
  C.A. No. 3:01-CV-0485, 2010 WL 817519 (M.D. Pa. Mar. 9, 2010).................13

*Baldwin Graphic Systems v. Siebert*, 512 F.3d 1338
  (Fed. Cir. 2008) ...................................................................................63

*Brine, Inc. v. STX, L.L.C.*,

367 F. Supp. 2d 61 (D. Mass.)................................................................79

*Chiuminatta Concrete Concepts v. Cardinal Industries,*
  145 F.3d 1303 (Fed. Cir. 1998) ..........................................................80

*Cybor Corp. v. FAS Technologies, Inc.,*
  138 F.3d 1448 (Fed. Cir. 1998) ..........................................................26

*Digital-Vending Services International v. University of Phoenix,*
  672 F.3d 1270  (Fed. Cir. 2012) ........................................................26

*Donovan v. Mazzola,*
  761 F.2d 1411 (9th Cir. 1985) ............................................................27

*Entegris, Inc. v. Pall Corp.,*
  490 F.3d 1340 (Fed. Cir. 2007) ............................................. 27, 28, 30

*Fiskars, Inc. v. Hunt Manufacturing Co.,*
  221 F.3d 1318 (Fed. Cir. 2000) ..........................................................57

*Funai Electric Co., Ltd. v. Daewoo Electronics Corp.,*
  616 F.3d 1357 (Fed. Cir. 2010) ......................................... 58, 62, 65, 77

*Goldenberg v. Cytogen, Inc.,*
  373 F.3d 1158 (Fed. Cir. 2004) ..........................................................70

*H.A. Jones Co., Inc. v. KSM Fastening Systems, Inc.,*
  745 F.2d 630 (Fed. Cir. 1984) ............................................................32

*In re TMI Litigation,*
  193 F.3d 613 (3d Cir. 1999) ...............................................................26

*International Rectifier Corp. v. IXYS Corp.,*
  361 F.3d 1363 (Fed. Cir. 2004) ..........................................................71

*Kannankeril v. Terminix International, Inc.,*
  128 F.3d 802 (3d Cir. 1997) ...............................................................45

*KSM Fastening Systems, Inc. v. H.A. Jones Co., Inc.,*
  776 F.2d 1522 (Fed. Cir. 1985) ......................................... 35, 36, 47, 53

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ....................................................................................45

*Kumho Tire Co., v. Carmichael*,
  526 U.S. 137 (1999) ....................................................................................26

*LMK Enterprises, Inc. v. Perma-Liner Industries, Inc.*,
  423 F. App'x 972 (Fed. Cir. 2011)...................................................... 27, 30, 32

*Lucent Technologies, Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .................................................................79

*Majorette Toys (U.S.) Inc. v. Darda, Inc. U.S.A.*,
  798 F.2d 1390 (Fed. Cir. 1986) .................................................................32

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) ...................................................................61

*Merial Ltd. v. Cipla Ltd.*,
  681 F.3d 1283 (Fed. Cir. 2012) ........................................................... passim

*Micro Chemical, Inc. v. Lextron, Inc.*,
  317 F.3d 1387 (Fed. Cir. 2003).................................................................26

*Motorola v. Computer Displays, International*,
  739 F.2d 1149 (7th Cir. 1984)...................................................................28

*Mycogen Plant Science, Inc. v. Monsanto Co.*,
  252 F.3d 1306 (Fed. Cir. 2001) ............................................................ 72, 74

*Mykrolis Corp. v. Pall Corp.*, No. 03–10392,
  2005 WL 81920 (D. Mass. Jan 12., 2005) .....................................................30

*National Presto Industries, Inc. v. W. Bend Co.*,
  76 F.3d 1185 (Fed. Cir. 1996) .................................................................57

*Norian Corp. v. Stryker Corp.*,
  432 F.3d 1356 (Fed. Cir. 2005)................................................................64

*Omega Engineering, Inc, v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ............................................................72

*Peloro v. United States*,
    488 F.3d 16 (3d Cir. 2007) ........................................................ 71, 72

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ............................... 58, 59, 60, 71

*Pineda v. Ford Motor Co.*,
    520 F.3d 237 (3d Cir. 2008) ...........................................................26

*Robert Bosch, LLC v. Pylon Manufacturing Corp.*,
    719 F.3d 1305 (Fed. Cir. 2013) .....................................................33

*Special Devices, Inc. v. OEA, Inc.*,
    269 F.3d 1340 (Fed. Cir. 2001) .....................................................33

*Stumbo v. Eastman Outdoors, Inc.*,
    508 F.3d 1358 (Fed. Cir. 2007) .....................................................71

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001) .....................................................73

*TiVo Inc. v. EchoStar Corp.*,
    646 F.3d 869 (Fed. Cir. 2011) ............................................... passim

*TiVo v. Echostar Communications*,
    516 F.3d 1290 (Fed. Cir. 2008) .....................................................64

*U.S. Fire Insurance. Co. v Asbestospray Inc.*,
    182 F.3d 201 (3d Cir. 1999) ...........................................................28

## STATUTES

28 U.S.C. § 1292(c)(2)...........................................................................34

ix

# <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| '488 Patent | U.S. Patent No. 6,335,488 (the patent asserted here) |
| '050 Patent | U.S. Patent No. 5,266,050 |
| '106 Patent | U.S. Patent No. 5,373,106 |
| '164 Patent | U.S. Patent No. 5,171,164 |
| '831 Patent | U.S. Patent No. 6,521,831 |
| '933 Patent | U.S. Patent No. 6,080,933 |
| Arlington | Arlington Industries, Inc. |
| Bridgeport | Bridgeport Fittings Inc. |
| 0485 Action | *Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*, No. 3:01-CV-0485 (M.D. Pa.) |
| '488 Judgment and Injunction or '488 Injunction | The Confession of Judgment and Injunction entered by the court in this case on January 18, 2012. |
| '164 and '050 Judgment and Injunction | The Confession of Judgment and Injunction entered by the court in the 0485 Action in 2006. |
| Enjoined Connectors or Speed-Snap connectors | Bridgeport 590-DCS, 590-DCSI |
| Accused Connectors or Whipper-Snap connectors | Bridgeport 38ASP, 380SP |
| SNAP$^2$IT® connectors | Arlington 38AST, 380ST |
| BBr. | Bridgeport's Brief for Defendant-Appellant |

## STATEMENT OF RELATED CASES

Two cases are related to the appeal presently before this Court, within the meaning of Federal Circuit Rule 47.5(b). Both cases involve the same parties and either the same or related products, patents, and claim terms.

1.      In the appeal from *Arlington Industries v. Bridgeport Fittings,* No. 01-cv-0485 (M.D. Pa.) ("*Arlington I*") this Court addressed patent claims overlapping with, and patents related to, those at issue in this appeal. The patent-in-suit in *Arlington I* was the '050 Patent, a sibling of the '106 Patent, which is incorporated by reference in its entirety into the patent at issue in this appeal—the '488 Patent.

In Arlington I, the court construed the term "surrounding" in claim 8 of the '050 Patent to mean "significantly bordering." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 290 F. Supp. 2d 508, 521-22 (M.D. Pa. 2003). That same term, appearing in claim 1 of the '488 Patent is at issue in this appeal. Arlington I resulted in a jury verdict of both colorable imitation and infringement, and involved both the Enjoined and Accused Connectors at issue in this appeal. This Court issued a Rule 36 Affirmance of the final judgment. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, Nos. 2010-1377, -1400, -1408 (Fed. Cir. Sep. 5, 2012).

2.      This Court also addressed overlapping patent claims and related patents in the appeal from *Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*,

No. 3:06-cv-1105 (M.D. Pa.) ("*Arlington II*"). As in *Arlington I*, the patents-in-suit in *Arlington II* were the '050 Patent and '831 Patent.

The opinion, authored by Chief Judge Rader, held that the term "spring metal adaptor" in claim 8 of the '050 Patent and claim 1 of the '831 Patent means "an adaptor made of spring metal" and does not require a split. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 2010-1025, 632 F.3d 1246 (Fed. Cir. 2011). The same limitation "spring steel adapter" is presently at issue in this appeal.

## JURISDICTIONAL STATEMENT

The Court has no jurisdiction over this appeal under either 28 U.S.C. §§ 1292(a)(1), (c)(1), or (c)(2).

## STATEMENT OF ISSUES

1.    Whether this Court lacks subject matter jurisdiction over this appeal from a civil contempt order when:

(a)    The court found the Accused Products were mere colorable imitations of the adjudicated infringing Enjoined Connectors, and thus covered by the original injunction; and

(b)    the court has not yet determined the amount of sanctions to enter against Bridgeport, and proceedings related to the sanctions remain ongoing at the court.

2.    Whether the court's findings that Bridgeport's Accused Connectors are mere colorable imitations of its Enjoined Connectors should be affirmed, given ample record evidence that:

(a)    Any modifications to Accused Connectors from the Enjoined Connectors were insignificant in form, application and function;

(b)    The Accused Connectors do the same work in substantially the same way, and accomplish substantially the same result, as the Enjoined Connectors;

3

(c)     Bridgeport marketed both the Enjoined Connectors and the Accused Connectors as interchangeable with Arlington's patented connector, explicitly trading on the products' equivalence to the patented device; and

(d)     All but one of the purported modifications raised by Bridgeport and its expert relate to features that are not required by the claim to establish infringement nor marketed to customers as significant.

3.     Whether the findings of direct and indirect infringement should be affirmed because the court properly construed the claim term "cylindrical" to mean "having the approximate form of a cylinder" and the term "surrounding" to mean "significantly borders."

4.     Whether Bridgeport should be prevented from collaterally attacking the scope of the injunction nine years after Bridgeport negotiated and stipulated to the original terms and it was not modified by the court in its contempt order.

## INTRODUCTION AND STATEMENT OF THE CASE

This contempt case was brought by Arlington, again, to enjoin Bridgeport's continued and flagrant violations of federal injunctions and Arlington's intellectual property rights. On January 28, 2002, Arlington brought the instant action for infringement of the '488 Patent against a subset of Bridgeport's products accused in a related '0485 Action. After three years of litigation, in 2004, Arlington and Bridgeport entered into a settlement agreement settling both actions, whereby Bridgeport admitted, inter alia, that its Speed-Snap and Snap-In Products infringed the '050 and '488 Patents and to be enjoined for the duration of the patents, respectively.

But only 16 months later, Bridgeport launched another line of infringing products that were mere colorable imitations of the Enjoined Connectors called the "Whipper-Snap" connectors, which included the two Accused Connectors. In 2009, a jury found, inter alia, the Accused Connectors infringed the '050 Patent and wee colorable imitations of the Enjoined Connectors. Before the injunction expired, however, Arlington notified Bridgeport of its continuing obligations with respect to the '488 Injunction as it relates to the Accused Connectors. That verdict and its underlying claim construction, relevant to the issues in this appeal, was affirmed by this Court on September 6, 2012.

Undeterred by Arlington's notice, Bridgeport re-launched the Accused Connectors immediately after expiration of the '050 Patent, in violation of the '488 Patent.  Arlington filed an unopposed motion to enter Defendant's Confession of Judgment and Injunction, which was granted.   The clerk entered the ''488 Injunction and this matter was reopened.  Arlington filed its motion for contempt for violating the '488 Injunction to hold Bridgeport in contempt, to enjoin Bridgeport from continuing to make, sell or use the Accused Connectors, and to pay Arlington its lost profits and attorneys fees incurred as a result of their contempt.   A hearing was held on October 25-26, 2012, December 17, 2012, and February 20, 2013.   On March 19, 2013, the district court found the Accused Connectors were colorable imitations of the Enjoined Connectors and thus expressly covered by the '488 Injunction.  It did not alter, amend, or modify the injunction.  In addition to ordering Bridgeport in compliance with the preexisting injunction, it ordered the parties to attempt to amicably resolve the issues of attorneys fees and lost profits, or it would schedule a hearing(s) to resolve the issues.

Before any proceedings were held to determine the nature or amount of Arlington's sanctions award, Bridgeport filed the instant appeal.  Arlington moved to dismiss for lack of jurisdiction but this Court reserved the issue for the merits

panel. Bridgeport has since filed a motion to stay the district court proceedings on the sanctions, which Arlington has opposed.

## STATEMENT OF FACTS

### I.    Arlington Revolutionized the Electrical Connector Industry

Before Arlington invented its patented Snap-Tite® connectors, the most common electrical connectors—which connect an electrical cable to a junction box—featured a threaded lock nut.  A1; *Arlington*, 632 F.3d at 1249.  The cable would be secured in the connector by a screw that tightens a clamp that presses against the cable:



**Arlington SG38 Connector**

A31(1:25-26); A3944.

In 1992, Arlington revolutionized the industry with its Snap-Tite® connectors.  These connectors featured a spring steel adapter that allows the connector to easily snap into a junction box using one hand, reducing the time and effort required for installation while offering good electrical continuity between the connector and the junction box:



**Arlington Snap-Tite® SG38ASP**

A3943; 632 F.3d at 1249.  Arlington obtained several patents covering its Snap-Tite® connectors, including the '164 Patent, in 1992, and the '050 Patent, a continuation of the '164 Patent, the following year.

In 1998, Arlington further revolutionized the industry with its Snap$^2$It® connector:



**Arlington 38AST Connector**

A3942; A1.  Previous connectors required a screwdriver to fix the position of the armored cable within the junction box.  A3944; A2253:1-54:11; A3908(1:13-25). The Snap$^2$It® connector added an internal spring steel locking ring inside the trailing end eliminating the need for tools—cables could be snapped into the connector, and the connector snapped into the box.  A3908(1:9-11); A118-225.

9

Arlington was awarded several patents on its Snap$^2$It® products, including the '488

Patent. A41(9:20-22). Arlington's marketing illustrates the two "snaps" of its

invention:



A223.

## II.   Bridgeport's Two Decades of Copying

In 1992, shortly after Arlington filed for the '164 Patent, Bridgeport's

President, Delbert Auray, obtained a sample of Arlington's Snap-Tite® connector

A2586:22-88:3. He found it interesting that the connector was not threaded and

was developed especially to receive the spring steel adapter. A2588:6-19. He

discussed the connector with Bridgeport's engineering manager, Kenneth Kiely,

who then examined its function. A2588:20-89:4. Despite being "concerned"

about Arlington's '050 Patent, Bridgeport "did not want to be excluded" and

"wanted to be able to make a product [them]selves." A2590:6-19. Bridgeport

brought its infringing Snap-In product line to market in 1998 despite knowing that

Arlington's Snap-Tite® products were covered by patents. A2589:5-11.

Arlington sued Bridgeport for infringement of the '164 and '050 Patents soon thereafter. Within two years, Bridgeport launched its Speed-Snap connectors (the Enjoined Connectors) to compete with Arlington's Snap²It® connectors, specifically advertising the "faster, easier installation" and "no tools" benefits resulting from Arlington's two-snap invention:

**Arlington's Snap²It® Connectors**        **Enjoined Connectors**





A219                                    A3227

In January 2002 Arlington brought this action, asserting claim 1 of the '488 Patent against Bridgeport's Enjoined Connectors. By January 2004, the parties had exchanged expert reports setting forth their claim construction and infringement positions. A250-76; A305-21. Three months later, Bridgeport admitted defeat. It

entered into a Settlement Agreement in which it submitted to the '164 and '050 Judgment and Injunction, covering an entire line of connectors including the Enjoined Connectors, and the '488 Judgment and Injunction in this case, covering only the Enjoined Connectors). A3920. Bridgeport admitted that the '164, '050, and '488 Patents were valid and infringed by Bridgeport's accused products, and agreed to be permanently enjoined from "directly or indirectly making, using, selling, offering for sale or importing or causing or inducing others to make, use, sell, offer to sell, or import" the accused products, or colorable imitations thereof. A3936-37.

Just 16 months after admitting that its Snap-In and Speed Snap connectors infringe Arlington's patents, Bridgeport returned to the market with a new infringing line of products called the "Whipper-Snap" connectors, which included the Accused Connectors. Bridgeport designed this new line of products "to include all the Arlington applications," enable the contractor to install the connector using only one hand, and "perform the same function when inserted into a junction hole" as Arlington's products. A2630:10-11; A2626:4-2628:4; A4041-42.

In 2006, Arlington requested that Judge Conner enter the '164 and '050 Judgment and Injunction, and reopen the 0485 Action in order to determine whether the Whipper-Snap connectors infringe the '050 Patent and are colorable imitations of the Snap-In connectors. A2. In 2009, a jury answered those

questions in the affirmative, finding that Bridgeport's Whipper-Snap connectors infringe the '050 Patent, and that 26 of those connectors, including the Accused Connectors, were mere colorable imitations of Bridgeport's previously enjoined products, including the Enjoined Connectors.  A2 (citing *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, C.A. No. 3:01-CV-0485, 2010 WL 817519, at *2 (M.D. Pa. Mar. 9, 2010)).  The court permanently enjoined the entire line of Whipper-Snap connectors for the remaining term of the '050 Patent, which expired in December 2011. *Id.*

The week before the '050 Patent was set to expire, Arlington reminded Bridgeport that, while it could return to the market with  28 of the 30 Whipper-Snap connectors subject to the '050 Injunction, the Accused Connectors are colorable imitations of the Enjoined Connectors and remain subject to the '488 Injunction until 2018.  A2-3. Bridgeport began selling the Accused Connectors anyway.  A3.  Arlington moved for contempt.

## III.   The Contempt Proceeding

### A.   Dr. Rahn's Testimony Regarding Colorable Imitation and Infringement

Dr. Christopher D. Rahn testified for Arlington regarding colorable imitation and infringement.  Dr. Rahn is a Professor of Mechanical Engineering and Director of the Mechatronics Research Laboratory at the Pennsylvania State University. A123¶2; A156.  He has published over 150 technical conference and journal

13

papers and has been honored with awards from various institutions, including the American Society of Mechanical Engineers ("ASME"), where he is an esteemed fellow.  A157-68; A170.  In addition to this case, Dr. Rahn has been recognized as an expert in several district court litigations between the parties (A123¶3; 0485 Action; *Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*, C.A. No. 3:06-1105 (M.D. Pa.)), wherein his constructions have all been affirmed by this Court.

Dr. Rahn limited his testimony to the "leading end external cylindrical surface" and "surrounding said leading end external cylindrical surface" limitations of claim 1, as those were the only limitations related to Bridgeport's asserted modifications to the Accused Connectors.  A8-9; A1772; A2201:11-02.

### 1.    "Leading End External Cylindrical Surface"

Dr. Rahn compared the Enjoined and Accused Connectors' leading end external cylindrical surface through physical inspection, measurements, and by examining their function, including through electrical tests.  A2227:10-14.  He first determined what part of the admitted infringing Enjoined Connectors constitutes the leading end surface that claim 1 requires to be "cylindrical."  A2212:1-17.  He did so with reference to the '488 Patent which discloses embodiments that refer to the entire surface between the lip and the flange as a cylindrical surface.  A3050:5-51:7.



A36(Fig.15)(annotated); A40(7:33-38); A139.  That entire surface is described as accommodating the spring steel adapter (orange, below) that claim 1 requires to "surround" the "cylindrical" surface.  A40(7:36-38).



A3994(Fig.22)(annotated).

Dr. Rahn applied the '488 Patent's claim language and disclosures to determine that the leading end cylindrical surface of the Enjoined Connectors is likewise everything forward of the flange, excluding the lip.  A3050:24-51:7; A3939 (below, blue annotation added).



His understanding was further confirmed because on the Enjoined Connector, that part of the leading end accommodates the "surrounding" connector.  A3048:24-51:7; A3939 (below).



Dr. Rahn next turned to the Accused Connectors and likewise determined that their leading end cylindrical surface consists of everything forward of the flange, excluding the lugs.  A2216:20-25; A3940 (below, blue annotation added).



As with the '488 Patent embodiments and Enjoined Connectors, this portion of the Accused Connectors accommodates the "surrounding" adapter.    A2216:14-19; A3940 (below).



Dr. Rahn further explained that both the lip and the lugs (orange, below) serve the function of preventing the adapter from falling off and therefore neither is part of the leading end cylindrical surface which simply provides a seat for the adapter. A2216:14-17:4; A3939, A3940 (below, annotations added).



Dr. Rahn physically inspected the surfaces and found no significant differences between the Enjoined Connectors' "stepped" surface and the "tapered" surface on the Accused. A2227:1-30:23. He conducted electrical tests to see if the tapered surface performed the same function in substantially the same way to produce substantially the same result. A2231:4-37:22.

Dr. Rahn also measured the surfaces of the connectors themselves, and on Bridgeport's engineering drawings, to compare the degree to which each deviated from a perfect cylinder. A2213:22-19:5. He did so by employing a standard deviation methodology. A2214:10-15. Dr. Rahn explained that this method would be the most accurate for determining the surface of the types of products at issue (A2214:16-20) and why Bridgeport's methods, including using a CMM machine, were inappropriate (A3081:1-84:23).

17

Using his measurements, Dr. Rahn determined that the surfaces of the Enjoined and Accused Connectors deviate from a perfect cylinder by 5% and 3-4%, respectively (A2217:5-25; A3946), and opined that this difference is insignificant. (A2218: 24-19:5). Dr. Rahn came to the same conclusion by calculating the surface deviation using Dr. Williamson's methodology. A2219:6-16; A2220:3-20:1; A3953. Using Bridgeport's own measurements, and its preferred cylindricity method, Dr. Rahn further calculated that the cylindricity deviation for the Enjoined and Accused Connectors' differed by an insignificant .001 inches. A3074:16-75:19; A3076:18-78:1. Dr. Williamson did not dispute the accuracy of Dr. Rahn's measurements or calculations. A2870:18-19.

Dr. Rahn also conducted an industry-required electrical resistance test on a sample of the Accused Connectors, and compared it to an Accused Connector with the taper removed. A4064-66; AA2231:12-33:12; A2235:7:16; A3198:12-22. The test showed that the taper on the Accused Connectors had no significant effect. A2235:17-36:1. Dr. Williamson admitted as much (A2857:15-58:6) and also admitted that the taper had no effect on the mechanical connection of the Accused Connector. A2858:13-22. He also admitted to having conducted no tests on the electrical function of the Connectors himself. A2854:17-24. While Dr. Williamson claimed other differences between the Enjoined and Accused Connectors, such as the number of tensioning tangs on their adapters or their

18

angles of misalignment, he admitted that none of these features were required by the claim.  A2833:1-2841:10.

As for infringement, Dr. Rahn analyzed his measurements of the Accused Connectors' leading end surface and opined that the surface has "the approximate form of a cylinder" and meets the "cylindrical" limitation.   A2283:10-86:8; A3139:2-3140:9; A1194; A1196.  He also compared this deviation to that of the infringing Enjoined Connectors' surface, and came to the same conclusion.  A25; A2281:23-2286:8; A3139:2-3141:2; A2217:5-A2219:5; A2220:3-2221:8.

### 1.    "Surrounding Said Leading End Cylindrical Surface"

Dr. Rahn testified that the function, way, and result of how the adapter "surrounds" the leading end cylindrical surface is the same in both the Enjoined and Accused Connectors, and that the products are no more than colorably different with respect to that limitation.  A2238:19-42:22.



**Enjoined Connectors**                    **Accused Connectors**

Dr. Rahn also opined that the Accused Connectors continue to meet the "surrounding" limitation. A2286:9-88:20. The court agreed on both counts, A17-20, and Bridgeport does not challenge those findings on appeal.

### B. Bridgeport's Testimony Regarding Its Connectors' Functional Equivalence

Arlington also presented testimony from Bridgeport to demonstrate the lack of meaningful differences between the Enjoined and Accused Connectors. Bridgeport's employees testified that both the Accused and Enjoined Connectors are interchangeable with Arlington's patented products (A2614:22-15:16; A2684:14-85:2; A2630:10-11; A2626:4-28:4), and that Bridgeport cross-referenced them as such on its website (A2684:12-24; A2290:12-91:20; 2683:13-23), informing users that they are interchangeable (A2643:15-44:4).

### C. Bridgeport's Advertisements Touted Arlington's Patented Features but Were Silent on Purported Modifications

Arlington also presented evidence that Bridgeport's advertising of the Accused Connectors made no mention of its purported modifications to the Enjoined Connectors, but rather highlighted the same patented features previously touted for the Enjoined Connectors. A3957(emphasis added); A3954.

**D.      Evidence of Bridgeport's Direct and Indirect Infringement**

To demonstrate Bridgeport's direct and indirect infringement, Arlington presented a promotional video that Bridgeport posted on YouTube on the day that the '050 Injunction expired, entitled "WHIPPER-SNAP® Snap-In Fittings Demo." A3968. The video featured Bridgeport's technical sales manager, Eric Cerasale, performing every step of claim 1 using the Accused Connectors and instructing Bridgeport's customers to do the same. *Id.* Arlington also presented additional marketing materials in which Bridgeport instructed its customers to use the Accused Connectors in an infringing manner, including a video from Bridgeport's website (A3969) along with evidence of significant sales of the Accused Connectors (A1054; A1240). A26-27. This evidence went undisputed.

**E.      The District Court's Claim Construction**

**1.      "Cylindrical"**

The court interpreted the term "cylindrical" to mean "having the approximate form of a cylinder." A22. It based this construction "on the '488 Patent and accompanying embodiments, which portray an external cylindrical surface on the leading end of a connector that has varying cross-sections along its axial length." *Id.* The court rejected Bridgeport's proposed construction, which excluded these embodiments. A22-23. Thus, the court found that the '488 Patent supports the conclusion that "cylindrical" means "having the approximate form of

21

a cylinder," and "does not limit the claim to only external surfaces that have a circular cross-section which remains constant along their axial length." A23. "In short," "cylindrical" is "not the equivalent of a perfect cylinder." *Id.*

## 2. "Surrounding"

The court construed the term "surrounding" to mean that the spring steel adapter "significantly borders" the connector's leading end external cylindrical surface. A24. This construction was supported by the embodiments in the '488 Patent, and the '106 Patent incorporated by reference. *Id.* The court further found its claim construction supported by the prior claim construction of the same term in the '050 and '164 patents in the '0485 Action. *Id.* The court rejected Bridgeport's proposal to limit the term to require that it "[completely] encircles" the external cylindrical surface. *Id.*

## F. Bridgeport's Patents

Although Bridgeport argued that its patents have relevance to the colorable imitation determination, it did not prove that its Accused Connectors practice the patents, or that the patent claims encompassed any non-colorable differences between the Enjoined and Accused Connectors.

## G. The District Court's Contempt Order

On March 19, 2013, the court found Bridgeport in contempt of the '488 Injunction. A1-30. Despite Bridgeport's attempts to introduce evidence irrelevant

to the claims, which resulted in over 1,000 pages of testimony, the court weighed the relevant evidence and determined that the Accused Connectors are colorable imitations of the Enjoined Connectors and infringe claim 1. *Id.*

The court entered an injunction mirroring the scope of the '488 Injunction agreed to by Bridgeport in 2004, and expressly enjoined the Accused Connectors. A29-30; A64. The parties' efforts to resolve the issue of sanctions were unsuccessful (A30 ¶ 6) and no proceedings have yet taken place to determine the proper award.

## SUMMARY OF THE ARGUMENT

The district court's contempt order is not an appealable interlocutory order that falls within 28 U.S.C. § 1292(a)(1). First. the court did not facially grant, continue, or modify an injunction. The district court's order was simply an interpretation that the allegedly redesigned products were subject to a previously issued injunction already in place. Second, the court's order is not a "a judgment in a civil action for patent infringement" that is "final except for an accounting:" it is a civil contempt order where sanctions have not yet been imposed, which the Supreme Court and this Court recognize as unappealable.

The court correctly found Bridgeport in contempt after determining that Bridgeport's Accused Connectors were colorable imitations that infringed Arlington's '488 Patent. The court properly employed the *TiVo* standard, comparing the Accused and Enjoined Connectors, construing the asserted claims, and determining that the Accused Connectors infringe the '488 Patent. Arlington proved by clear and convincing evidence that the modifications from the Enjoined to the Accused Connectors were insignificant..

The court correctly construed "cylindrical" in accordance with the term's ordinary meaning in view of the '488 Patent specification, and consistently with Bridgeport's previous admission of infringement. The court rejected Bridgeport's

proposed construction, which contradicted both. As to "surrounding," the court's construction was both necessitated by a previous construction of that term in a related patent, affirmed by this Court, and consistent with the intrinsic record, which Bridgeport's proposal contradicted.

that the court's findings of infringement were supported by ample evidence and not clearly erroneous. Bridgeport does not dispute that the Accused Connectors meet the "surrounding" limitation, as construed. And even under Bridgeport's proposed constructions, both limitations continue to be met. Separately, sufficient evidence supported the court's finding of induced infringement.

Bridgeport's time to appeal the scope of the court's injunction—the terms of which Bridgeport bargained for and agreed to in 2004—has long passed. Nor has Bridgeport demonstrated evidence of any non-infringing activity being enjoined.

## ARGUMENT

### I.   Standard of Review

"When reviewing a district court's determination as to contempt of an injunction against infringement," this Court "appl[ies] an abuse of discretion standard, [] and the factual findings underlying a contempt decision are reviewed for clear error []." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1292-1293 (Fed. Cir. 2012) (internal citations omitted). This Court does not find an abuse of discretion

unless the court "made a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact finding." *Abbott Labs. v. Torpharm, Inc.*, 503 F.3d 1372, 1380 (Fed. Cir. 2007). Further, this Court does not reverse the underlying factual findings as clearly erroneous so long as "the district court's account of the evidence is plausible in light of the record viewed in its entirety … even though [this Court may be] convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. Bessemer City*, 470 U.S. 564, 573-574 (1985).

Claim construction is reviewed *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). This Court affirms infringement even in the presence of an erroneous claim construction, if the court's error was harmless. *Digital-Vending Servs. Int'l v. Univ. of Phoenix*, 672 F.3d 1270, 1280 (Fed. Cir. 2012)

"The admissibility of expert testimony is reviewed under regional circuit law. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003). The Third Circuit reviews *Daubert* challenges for abuse of discretion, and the threshold for admissibility of expert evidence is low. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243, 247 (3d Cir. 2008). Decisions to exclude evidence are similarly reviewed for abuse of discretion. *Kumho Tire Co., v. Carmichael*, 526 U.S. 137, 152 (1999).

## II. This Court Lacks Jurisdiction Over Bridgeport's Appeal from an Interlocutory Contempt Order.

This Court lacks jurisdiction over this appeal because it stems from a contempt order that (1) simply interprets a prior injunction without modifying it and (2) leaves sanctions yet to be determined. The legal relationship between Bridgeport and Arlington after the court's contempt order is identical to what it was when the injunction issued—Bridgeport is enjoined from infringing activity with colorable imitations of the 590-DCS and 590-DCSI products. Because there has been no substantive modification of the original injunction, there is no jurisdiction under §§1292 (a)(1). *See Aevoe Corp. v. AE Tech Co.*, 727 F.3d 1375 (Fed. Cir. 2013). .

In addition, it is well established law that a party cannot appeal a civil contempt order until sanctions have been imposed. *Alexander v. United States*, 201 U.S. 117 (1906). *Donovan v. Mazzola*, 761 F.2d 1411, 1416–17 (9th Cir. 1985) ("civil contempt is not appealable until sanctions have been imposed"); *LMK Enters., Inc. v. Perma-Liner Indus., Inc.*, 423 F. App'x 972, 973 (Fed. Cir. 2011) *Aevoe*, 727 F.3d at 1380-81 (a civil contempt order interpreting or enforcing an injunction is "generally not appealable until final judgment, [a]nd "[t]his is particularly so *where no sanction had yet been imposed for that contempt and proceedings with respect to that question remained ongoing* at the time the appeal before us was filed.") Because Section 1292(c)(2) does not apply in a contempt

case where sanctions have not been imposed, Bridgeport's premature appeal should be dismissed.

### A. The District Court's Contempt Order Was An Interpretation Not A Modification of the Prior Injunction.

Under Third Circuit law, which applies to the issue of whether an injunction has been modified, *Aevoe*, 727 F.3d at 1381, appealability under §1292(a)(1) is construed narrowly. In particular, "special attention [must be payed] to the distinction between a 'modification' of an injunction, which is appealable, and the clarification of one, which is not." *Am. Bd. of Surgery v. Lasko*, 2013 WL 3826696, at *3 (3d Cir. 2013) (citing with approval *Entegris*, 490 F.3d at 1347); *U.S. Fire Ins. Co. v Asbestospray Inc.*, 182 F.3d 201, 207 (3d Cir. 1999). Where an order of contempt does not change the effect or character of the injunction, *i.e.*, does not expand its scope, then it is merely a clarification or interpretation of the injunction, not a modification. *Lasko*, 2013 WL 3826696, at *3; *see also Motorola v. Computer Displays, Int'l*, 739 F.2d 1149, 1155 (7th Cir. 1984).

Here, the order at issue does not change the effect or character of the Confession of Judgment and Injunction to which Bridgeport agreed. When Bridgeport stipulated to infringement, it agreed to be permanently enjoined from "directly or indirectly making, using, selling, offering for sale or importing or causing or inducing others to make, use, sell, offer to sell, or import" the 590-DCS and 590-DCSI products "or any colorable imitations thereof during the term of the

28

'488 patent." A3936-37. The court's contempt opinion found the 380SP and 38ASP products were colorable imitations of 590-DCS and 590-DCSI, (A27), and it "PERMANENTLY ENJOINED" Bridgeport from the same acts of infringement recited in the injunction as to those colorable imitations "during the remaining term of U.S. Patent No. 6,335,488," (A29-30, ¶¶4,5). The court's order plainly did not change the effect or character of the original injunction because Bridgeport is enjoined from activity by the contempt order which is identical in character and effect to the original injunction. That is true even with the "separate command" directed to the 38ASP and 380SP products. (BBr.27.) Indeed, this Court recently concluded that making explicit in a contempt order what was already implicit in the language of the injunction did not constitute a modification under 1292(a)(1). *Aevoe*, slip op. at 12-14.

Bridgeport argues that because it could not have "anticipated" the court's claim construction when it entered into the Confession of Judgment and Settlement, the contempt order must have altered the legal relationship of the parties. (BBr.26) Bridgeport's focus is misplaced. This Court permits the district court to address new issues of claim construction in a contempt proceeding. *See Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1350 (Fed. Cir. 1998).

And here, it is clear that the legal relationship contemplated between Bridgeport and Arlington did not change: Bridgeport must continue to refrain, as before, from infringing the '488 patent claims with "colorable imitations" of the originally accused products. The court has now identified the 380SP and 38ASP products as such colorable imitations. Applying an injunction to later-developed products found to be colorable imitations is not a modification of the original injunction. *Entegris*, 490 F.3d at 1345; *LMK*, 423 F. App'x at 973; *Aevoe* 727 F.3d at 1382-83.

Bridgeport attempts to distinguish *Entegris* on the ground that the court in that case "clearly stated that it was not modifying the original preliminary injunction." (BBr.27). But that is not quite right. *Entegris* explained that "the district court *clearly stated* that it was not modifying the original preliminary injunction *when it found* that Pall's sales of the slotted EZD–3 assembly violated the injunction. *Mykrolis Corp. v. Pall Corp.,* No. 03–10392, 2005 WL 81920, at *4 (D. Mass. Jan 12., 2005); *Entegris,* 490 F.3d at 1345. The court in *Entegris* never actually stated "we are not modifying the injunction." *Mykrolis*, 2005 WL 81920, at *4. Rather its "clear" statement was the colorable imitation determination. Similarly, the court here made a "clear" statement when it found that "the Accused Connectors are not more than colorably different than the

30

Enjoined Connectors" and "Bridgeport has violated the Confession of Judgment and Injunction."  A27.

Moreover, it is "the substance of the order rather than merely its language" that is controlling.  *Lasko*, 2013 WL 3826696, at *3.  And here, for the reasons stated above the substance of the contempt order clearly did not modify the injunction.  It is also beside the point that *Entegris* concerned a preliminary injunction.  (BBr.27.)  The language of  §1292(a)(1) is plainly applicable to every type of injunction.  And the type of injunction is immaterial to assessing whether the contempt order has modified or clarified it.

Because the court's contempt order did not change the scope or effect of the injunction, jurisdiction does not lie under 1292(a)(1).

## B.    There is No Jurisdiction Under 28 U.S.C. § 1292(c)(2) Because a Contempt Proceeding With Unquantified Sanctions Is Not "Final Except for an Accounting."

Bridgeport's appeal of the court's contempt order is premature because sanctions have not yet been determined.  It is well established law that a party cannot appeal a civil contempt order until sanctions have been imposed. *Alexander*, 201 U.S. at 117; *Donovan*, 761 F.2d at 1416–17; *LMK, Inc.*, 423 F. App'x at 973 ("an adjudication of civil contempt, such as here, is not appealable until sanctions have been imposed").

It is true that this Court has allowed an appeal under 28 U.S.C. § 1292(c)(2) where issues of validity, infringement, and damages had been decided, and the court had awarded attorneys' fees under 35 U.S.C. § 285, but had not yet determined the specific amount of attorneys' fees to be awarded. *Majorette Toys (U.S.) Inc. v. Darda, Inc. U.S.A.*, 798 F.2d 1390, 1391-92 (Fed. Cir. 1986). But that case was an appeal of a judgment following an action for patent infringement, not a civil contempt hearing.

In *LMK*, as in this case, the court had ordered but not yet imposed "monetary sanctions, including the award of attorney's fees and costs." While Bridgeport claims that there is "no principled basis for the Court to distinguish this case from its precedents" (BBr.30), *LMK* provides precisely that basis: section 1292(c)(2) does not apply in a contempt case where sanctions have not been imposed. *LMK, Inc.*, 423 F. App'x at 973. The only contempt case cited by Bridgeport, *H.A. Jones Co., Inc. v. KSM Fastening Sys., Inc.*, 745 F.2d 630, 630 (Fed. Cir. 1984), is inapposite because it involved an award of damages, not unquantified sanctions. And *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1337 (Fed. Cir. 2009), involves an appeal from a JMOL of infringement—it neither addresses jurisdiction nor involves a contempt proceeding.

Section 1292(c)(2) provides this Court jurisdiction over a patent infringement action that is "final except for an accounting." 28 U.S.C. §

1292(c)(2).  An "accounting" under 28 U.S.C. § 1292(c)(2) concerns damages, *see Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1316-17 (Fed. Cir. 2013), and does not encompass sanctions.  Bridgeport cites no law that treats a court's determination, quantification and subsequent imposition of contempt sanctions as "an accounting" separate from the merits that warranted the sanctions.  In fact, in *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340 (Fed. Cir. 2001), this Court distinguished the holdings of the *Budinich* and *Johanssen* opinions that Bridgeport cites.  Neither *Budinich* nor *Johanssen* address the issue of finality in view of sanctions.  *Id.* at 1345.

Because this Court has no basis to hear this appeal under either 28 U.S.C. §§ 1292(a)(1) or (c)(2), it should dismiss for lack of jurisdiction.

## III.  The District Court Properly Found Bridgeport in Contempt for Violation of the '488 Injunction.

A party is liable for contempt of a patent injunction if (1) it markets a new product that is no more than "colorably different from the [enjoined] product found to infringe" and (2) the new product infringes.  *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011).  Using the *TiVo* standard, and making the comparisons required by that decision, the court found Bridgeport to be in contempt of the '488 Injunction by clear and convincing evidence.  A5; A9-19.

Because the only modifications Bridgeport alleged to have made to the Enjoined Connectors concerned limitations two and three of claim 1 (A1772) the

court correctly limited the contempt hearing to those two limitations: "a leading end with an external cylindrical surface" and a spring steel adapter "surrounding" that surface.[1]  A8.  The court compared the features in the Enjoined and Accused Connectors corresponding to these two limitations and found by clear and convincing evidence that the Accused and Enjoined Connectors are "not more than colorably different" with respect to those limitations. .A19-20.[2]  The court then properly construed the claims (A20-25) and found that the Accused Connectors also meet both.  The Court also found by clear and convincing evidence that Bridgeport infringes claim 1 both directly and indirectly (A25-27), and Bridgeport has shown no clear error in those determinations.  Accordingly, the court did not abuse its discretion in finding Bridgeport in contempt of the '488 Injunction. *Merial*, 681 F.3d at 1292-93.

## A.    A Contempt Proceeding Was Appropriate.

Bridgeport contends that this case was not amenable to a contempt proceeding because it was "a first-ever claim construction and infringement trial." BBr.37-38.  But regardless of whether the previous order "included an exhaustive

---

[1] Bridgeport does not appeal this ruling.  BBr.2.

[2] Bridgeport does not appeal the court's finding of colorable imitation with respect to the "surrounding" limitation (A19).  BBr.34-58.

34

infringement analysis, it necessarily and conclusively established that [the enjoined product] met each limitation recited in the asserted claims." *Merial*, 681 F.3d at 1300. When, as here, there is a device adjudged to be infringing and subject to a consent decree, there "is an admitted infringement, and the claims of the patent may be construed in light of that admission when the court undertakes to determine whether a modified device is also an infringement in contempt proceedings." *KSM Fastening Sys. v. H.A. Jones*, 776 F.2d 1522, 1529 (Fed. Cir. 1985), *overruled on other grounds by TiVo*, 646 F.3d at 869. Nor is it erroneous to conduct claim construction during a contempt hearing. *Additive Controls*, 154 F.3d at 1349.

The contempt proceeding here was particularly appropriate given that a jury in 2009 found that the same Accused Connectors were colorable imitations of the same Enjoined Connectors and infringed a related Arlington patent, a verdict this Court affirmed. *Arlington*, 692 F. Supp. 2d at 495; *Arlington*, 477 F. App'x at 740. Bridgeport's claim of a "good-faith effort" to redesign is both untrue and irrelevant in light of "Supreme Court precedent [that] a lack of intent to violate an injunction alone cannot save an infringer from a finding of contempt." *TiVo*, 646 F.3d at 880 ("a defendant's diligence and good faith efforts are not a defense to contempt."). If ever there was a case for a summary proceeding, this was it.

## B. Bridgeport's Modification of the "External Cylindrical Surface" from a Stepped Shape to a Sloped Shape Was Insignificant in Form, Application and Function.

Clear and convincing evidence established that "the change from the stepped shape of the Enjoined Connectors' leading end external cylindrical surface to the sloped shape of the Accused Connectors' leading end external surfaces is insignificant." A16-17. The court found that "Arlington established by clear and convincing evidence" that the leading end external surfaces of both the Accused and Enjoined Connectors "perform substantially the same function in substantially the same way with substantially the same result." A17; *see KSM*, 776 F.2d at 1527-28 ("they are the same, even though different in name, form or shape'").

Specifically, the court held that "both leading end external surfaces connect the spring steel adapter to the connector's leading end (function) by providing a surface area for the adapter to surround (way) so that the adapter is mechanically and electrically connected to the leading end (result)." A17. A4150-55.

Dr. Rahn established that the change to the Accused Connectors' external cylindrical surface was insignificant in (1) "form," (2) "application" and (3) "function." A11-14; 2206:2-14; A2210:2-24:3. Based on the totality of evidence, the court did not clearly err in its colorable imitation finding.

### 1. The Court Correctly Identified the Connectors' "External Cylindrical Surface" as Part of its *TiVo* Analysis.

As required by *TiVo*, the court first identified the aspect of the Enjoined Connectors corresponding to the "external cylindrical surface" limitation to determine if the modification to that surface on the Accused Connectors was significant. A4-5(citing *TiVo*); A9-10n.2. The court identified the "external cylindrical surface" as "everything forward of the back flange of the leading ends, except for the lip." A10. It did so based on the intrinsic evidence from the '488 Patent, citing embodiments that depicted the "lip" and the "central flange" as defining the boundaries of the "external cylindrical surface." A10 (citing A40(7:34-38); A36(Fig.15); A39(6:2-4); A34(Fig.6); *see also* A40(7:34-38) ("[t]he seat 132 will later accommodate a spring steel adapter"); A3994(Fig.22) (surface highlighted in blue; surrounding adapter in orange).



In making its determination, the court also analyzed the Enjoined Connectors, noting that the admittedly infringing connectors must contain an "external cylindrical surface." A10. The court agreed with Dr. Rahn that the external cylindrical surface was the entire portion of the leading end between the lip and flange that the adapter "surrounds" (A9; A2212:1-17), but excludes the lip or flange because those features merely hold the adapter in place and are not part of the cylindrical surface/reduced diameter seat. A10n.2.

The court rejected Bridgeport's identification of the "external surface" on the Enjoined Connectors, noting that Bridgeport had advanced inconsistent theories throughout the proceeding. A9-10. In its opposition to the contempt motion, Bridgeport claimed there was "one cylindrical surface" consisting of three cylinders. A10(citing A347-48). But at the hearing, and here on appeal (BBr. 52-53), Bridgeport argues that the three "cylinders" annotated below on the Enjoined Connector (Front Step, Rear Step, and Recessed Area) "are in fact separate external cylindrical surfaces." A10.



A3939 (with and without adapter). Bridgeport's appellate argument (BBr.52-53) is also wholly inconsistent with Williamson's Declaration, which analyzed the same drawing included in Bridgeport's appellate brief. *Compare* BBr. 52-53("the Old Connectors clearly had *three external cylindrical surfaces* as shown...below") *with* A408("the three cylinders that compose *the 'cylindrical surface'* on the old design") (emphasis added).

At trial, Williamson also contradicted Bridgeport's current theory, as he refused to refer to the Front and Rear Step of the Enjoined Connectors as their own cylindrical surfaces or part of the "cylindrical surface." A2864:4-66:18 ("Q. ...[Y]ou ignored the measurements on the front step and back step, correct? A. Yes, I applied the measurements to *the external cylindrical surface*."; "You are correct I did not apply [the measurement formula] to the bits which I *don't think are part of the cylindrical surface* ") (emphasis added). Accordingly, the court

correctly rejected Bridgeport's inconsistent theories as to the identification of the external cylindrical surface. A9-10.

Bridgeport's new theory is further contradicted by the claim limitation related to "surrounding." The "steps" on the Enjoined Connectors (shown above), are the only portions the claimed "surrounding" adapter actually contacts. A3938; A2212:18-13:3. Thus, the court did not clearly err in concluding that the identified cylindrical surface encompasses the entire portion in front of the flange (except for the lip), including the raised steps, which are the only portions of the connector contacted by the "surrounding" adapter. While Williamson admitted the adapter only contacts the connector on the steps (A2845:9-21), he still claimed the steps were excluded from the cylindrical surface (A2865:3-4,19-22), contrary to Bridgeport's position on appeal. On the contrary, excluding the steps as Williamson did at trial, or claiming that the steps and recessed areas are "three separate surfaces" is illogical. *But c.f.*, BBr.52 (claiming, with no intrinsic support, that "multiple surfaces can lie in the reduced diameter area"). In determining the external surface on the Accused Connectors, the court similarly agreed with Arlington (rejecting Bridgeport's position) that the "lugs on the Accused Connectors are not part of the external surface because, like the lips of the Enjoined Connectors' leading ends, they hold the adapter in place." A10n.2.

The court's identification of the claimed external surface did not constitute a "piecemeal construction," as Bridgeport claims (A51), nor did Dr. Rahn "conflate three surfaces to form one." To the contrary the court was required to determine what constitutes the leading end external surface that claim 1 requires to be cylindrical on both the Enjoined and Accused Connectors in order to compare "the features relied upon to establish infringement and the modified features of the newly accused products." A5(quoting *TiVo*, 646 F.3d at 882). The court correctly identified that surface on both sets of products (as discussed above), and did not violate the "indefinite article" in doing so, as Bridgeport claims (BBr.51-53;60-62).

### 2. The District Court Heard Ample Evidence That the Accused Connectors' "External Cylindrical Surface" Was a Colorable Imitation.

Based on the proper identification of the external cylindrical surface, Dr. Rahn established and the court agreed that: (1) the external surfaces of the Accused Connectors are not "conical" but cylindrical; (2) the surfaces of the Enjoined and Accused Connectors deviate from a perfect cylinder in an insignificant amount, and (3) that the cylindrical surfaces of the Enjoined and Accused Connectors performed substantially the same function, in substantially the same way, to achieve substantially the same result. Bridgeport showed no clear error in the court's findings.

41

### a.    The Leading End External Surface of the Accused Connectors Was Neither a "Cone" Nor "Conical."

Bridgeport asserts, with no factual support, that because the Accused Connector has a slight taper, it is conical not cylindrical. As Arlington's expert illustrated below, however, the taper from front to back on the Accused Connectors is a mere forty thousandths of an inch. A3940;A3949.

Dr. Rahn illustrated, using drawings of the Accused Connectors, that (1) that the Accused Connectors are five inches from becoming a cone, and only .040" away from a perfect cylinder (A2206:15-10:1- A2208:18-09:1) and (2) that on a scale of 1 to 20, where 1 represented a perfect cylinder, and 20, a perfect cone, the Accused Connectors were 18 steps away from being a cone.





**Perfect Cylinder          Perfect Cone**

A3949; A2206:15-08:8; A4138-39;  A3949; A2209:2-10:1.

Dr. Rahn's measurements further demonstrated the insignificance of Bridgeport's modifications. A11-13.

> **b.    Dr. Rahn's Measurements Demonstrated that the Surface of the Accused Connectors Differed Insignificantly From the Surface of the Enjoined Connectors.**

Dr. Rahn also measured the surfaces of the connectors themselves, and on Bridgeport's engineering drawings, to compare the degree to which each deviated from a perfect cylinder.  A2213:22-19:5.  He did so by employing a standard deviation methodology.  A2214:10-15.  Dr. Rahn explained that this method would be the most accurate for determining the surface of the types of products at issue (A2214:16-20) and why Bridgeport's methods, including using a CMM machine, were inappropriate (A3081:1-84:23).

Using his measurements, Dr. Rahn determined that the surfaces of the Enjoined and Accused Connectors deviate from a perfect cylinder by 5% and 3-4%, respectively (A2217:5-25; A3946), and opined that this difference is insignificant.  (A2218: 24-19:5).  Dr. Rahn also calculated the surface deviation of the Enjoined and Accused Connectors using the ASME standard proposed by Dr. Williamson and came to the same conclusion.  A2219:6-16; A2220:3-20:1; A3953. Using Bridgeport's own measurements, and its preferred cylindricity method, Dr. Rahn further calculated that the cylindricity deviation for the Enjoined and Accused Connectors' differed by an insignificant .001 inches.  A3074:16-75:19; A3076:18-78:1.   Dr. Williamson did not dispute the accuracy of Dr. Rahn's measurements or calculations.  A2870:18-71:19.

### c.   The District Court Did Not Abuse Its Discretion in Relying on Dr. Rahn's Measurements of the Enjoined and Accused Connectors.

The court correctly rejected Bridgeport's *Daubert* challenge to Dr. Rahn's measurements and calculations showing an insignificant change to the external cylindrical surface.  A1766 at 17-19.  First, Bridgeport's brief omits significant facts relevant to this analysis: in addition to the standard deviation methodology, Dr. Rahn also calculated the products' cylindricity using the ASME standard (Bridgeport's preferred method), which also showed an insignificant modification

to the external cylindrical surface of the Connectors. A2219:6-16; A2220:3-20:1; A3953.

Regardless, Bridgeport has not met its burden to show that the court abused its discretion in relying on Dr. Rahn's standard deviation methodology. *Kumho Tire*, 526 U.S. 152. The court admitted this testimony after briefing and an evidentiary hearing, holding that "standard deviation is a reliable methodology" and whether "there may be a better methodology for this particular application is of no consequence." A1784. Bridgeport's claim that Dr. Rahn "presented no evidence" that standard deviation has been tested is false. He testified that it was "the industry standard for calculating a deviation" from a known shape. A1783. Dr. Rahn submitted two peer-reviewed papers on research sponsored by the Office of Naval Research related to a robotic "whisker" to identify underwater mines. A2169:24-71:22; A1479¶6; A1508-19.[3] Dr. Rahn met Rule 702's "liberal policy for admissibility," and Bridgeport has failed to show that the court abused its discretion in allowing the testimony. *Kannankeril v. Terminix lnt'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997).

---

[3] Bridgeport's claims that Dr. Rahn "did not consult anyone" and "never established a baseline" (BBr. 50) are not *Daubert* factors.

### d. The Court Properly Rejected Williamson's Cylindricity Measurements.

The court correctly rejected Williamson's "relative cylindricity calculation, which included the lugs on the Accused Connectors but not on the lips of the Enjoined Connectors and thus resulted in an inconsistent comparison." A17,n.8.



A3073:11-74:14.

Dr. Rahn testified, and the court agreed that "an accurate comparison between the Accused and Enjoined Connectors must either include or exclude both the lips and lugs." *Id*.; A1962. But making an "apples to apples" comparison, the same one the court adopted in light of the evidence (A17,n.8): Rahn compared the entire area of the Enjoined Connectors forward of the flange excluding the lip against the entire area of the Accused Connectors forward of the flange excluding the lips:

 

A3072:10-73:10.  Dr. Rahn showed, using Dr. Williamson's own measurements and preferred cylindricity method, that under the correct "apples to apples" comparison, the cylindricity deviation for the external cylindrical surface of Enjoined Connectors and that of the Accused Connectors were 0.035 inches and 0.036 inches, respectively.  A3074:16-75:19; A3076:18-78:1.  In other words, the difference is an insignificant 0.001 inches.

Accordingly, the court did not err in finding colorable imitation of this limitation.

**e.    The External Cylindrical Surface of the Accused Connectors Has the Same Function, Way, and Result as in the Enjoined Connectors**

Dr. Rahn also established the insignificant difference between the function of the external cylindrical surface in the Enjoined and Accused Connectors.  Two products are colorable imitations if they "do the same work in substantially the same way, and accomplish substantially the same result."  *KSM*, 776 F.2d at 1527.

Rahn examined the function, way, and result of the external cylindrical surface and found insubstantial differences between the two sets of Connectors.  A2221:9-38:4.  The function of the surface is to "connect[] the spring steel adapter

to the leading end of the die cast connector body." A2221:22-22:1. The way that both the Enjoined Connectors and Accused Connectors achieve that function is "by providing the surface area for the adapter to surround and contact." A2223:8-17. And the result in both sets of Connectors is that "the adapter is mechanically and electrically connected to the leading end of the member" A2223:22-24:3.

Dr. Rahn also presented the results of electrical tests showing an insignificant difference in the function of how the Accused Connector conducted electrical current with and without the taper. A2230:24-38:4. Dr. Rahn took an Accused Connector and removed the taper:



A4064; A4066; A2231:12-33:12. Dr. Rahn then conducted a resistance test, a "standard test [run] on electrical connectors to see how well they conduct electricity." A2235:7:16. Dr. Rahn testified that Underwriters Labs (UL) requires that electrical connectors comply with this resistance test before they may be sold. A3198:12-22.

Dr. Rahn ran the resistance test on the Accused Connector both with and without the taper.  A2235:1:6.  The results showed that the average drop in voltage for the Accused Connector and the Accused Connector without the taper was 47.8 and 48.6 millivolts respectively: an insignificant difference of 1.7%.  A2235:17-36:1.

Bridgeport's expert, Dr. Williamson, admitted that he conducted no tests on the electrical function of the Enjoined or Accused Connectors.  A2854:17-24.  Dr. Williamson also admitted that the taper on the Accused Connectors had no effect on the UL resistance test.  A2857:15-58:6.

In addition to showing the tapered external cylindrical surface of the Accused Connectors had an insignificant effect on the electrical connection to the adapter, Dr. Rahn also showed an insignificant change in mechanical connection: "[t]here was a very good strong mechanical connection, even without the taper." A2235:2-7.  Dr. Williamson admitted the taper had no effect on the mechanical connection of the Accused Connector.  A2858:13-22.

Thus, Arlington presented three categories of evidence showing the external cylindrical surface of the Accused Connectors was a colorable imitation: (1) physical inspection, (2) measurements—including using Bridgeport's figures and preferred methodology—and (3) the function of the cylindrical surface, including

the results of electrical tests. Bridgeport has not shown that the court clearly erred in finding colorable imitation in light of this clear and convincing evidence.

### 3. Designing Around Non-Patented Features

Bridgeport points to a laundry list of changes it refers to as "significant." But these changes are irrelevant to contempt as a matter of law, because, as Bridgeport admits, these modifications are "themselves not required by the claim." BBr.38. *TiVo*, 646 F.3d at 882. *TiVo* requires the focus on the elements of the adjudged infringing products that satisfy "specific limitations of the asserted claims" to determine if one of those infringing elements have been modified or removed. *TiVo*, 646 F.3d at 882.

Bridgeport failed to demonstrate how their "significant changes" were "tied" to the only two limitations at issue in the contempt proceeding: the "external cylindrical surface" element of limitation 2 and the "surrounding" element of limitation 3. Nearly every one of Bridgeport's modifications relates to the "spring steel adapter," which Bridgeport's expert admitted need only be made of spring metal. A2836:7-15.

For each of these randomly-chosen features listed in Bridgeport's brief, Bridgeport's own expert, Williamson, admitted that Arlington would not need to prove the existence of this feature or function to prove infringement of claim 1 of the ''488 Patent:

50

| Bridgeport's Purported Modification | Dr. Williamson's Admission |
|---|---|
| "Tolerance for misalignment." BBr. 41. | Not required to prove infringement. A2841:2-10. |
| Accused Connectors can be "inserted at an angle." BBr.42. | Not required to prove infringement. A2839:4-14. |
| The Accused Connectors "can be easily removed." | Not required to prove infringement. A2834:4-13. |
| A "new way to attach the adaptor." BBr.44. | Not required to prove infringement. A2840:17-41:1. |
| Accused Connectors have an "adaptor that contacts the knockout hole via the two large anchor tabs and the four tensioning tangs." BBr.45. | Only structure of adapter required to prove infringement is that it be made of spring metal. A2836:7-25. |
| "Greater long-term reliability." BBr.45. | Not required to prove infringement. A289:15-23. |
| The Accused Connectors "grip the knockout hole in a new way." BBr. 45. | Not required to prove infringement. A2835:16-23. |
| "Grommet is carried by the…adaptor." BBr. 46. | Not required to prove infringement. A2838:6-13. |

Bridgeport tries to portray a feature it calls the "ramps" as a "significant structure" that "did not exist" in the Enjoined Connectors. BBr.40-41. To the contrary, Dr. Rahn testified how the ramps actually made the cylindrical surface **more** like that in the Enjoined Connectors. A2374:25-80:2. He demonstrated the progression: (1) a figure from Bridgeport's '272 Patent filed in 2005 shows a

51

tapered connector, (2) a 2004 drawing of the Accused Connectors shows how the
surface became less tapered by cutting off the end portion and adding the ramps;
and (3) a 2008 drawing of the Accused Connectors shows how the diameter at the
base of the surface was reduced:



| Bridgeport patent figure (A1075) | Accused Connectors 2004 (A1192) | Accused Connectors 2008 (A1193) |
|---|---|---|

A2377:22-79:23. Thus, far from being "conical," the surfaces of the Accused
Connectors have become closer and closer to a straight cylinder over time.

There was ample evidence that the cylindrical surface of the Accused
Connectors is a colorable imitation of that of the Enjoined Connectors, and the
court did not clearly err in so finding.

### C. The District Court Did Not Clearly Err In Finding That Bridgeport Made Only An Insignificant Modification To How The Adapter "Surround[s]."

Arlington demonstrated the Accused Connectors were colorable imitations of the Enjoined Connectors with respect to the "surrounding" limitation. A19-20; A2216:20-17:4; A2238:19-42:22. Dr. Rahn testified to the function (A19; A2240:23:417), way (A19; A2241:8-16), and result (A19; A2241:17-42:1). A4157-62. Having failed to appeal this finding, BBr.2,34-58, Bridgeport has waived its right to challenge the court's finding of colorable imitation of the "surrounding" limitation.

### D. Arlington Presented Undisputed Evidence That Bridgeport Marketed Both the Enjoined and Accused Connectors as Functional Equivalents to Arlington's Products.

There was ample record evidence that Bridgeport marketed both its Enjoined and Accused Connectors as functionally equivalent to Arlington's patented embodiments. *KSM*, 776 F.2d at 1527. Bridgeport's engineering manager, Kenneth Kiely, testified that the Enjoined Connectors are functionally interchangeable with Arlington's patented products (A2614:22-15:16), which Bridgeport's executive Paul Suzio admitted to be, in turn, functional equivalents of the Accused Connectors. A2684:14-85:2. In fact, Bridgeport designed the Accused Connectors "to include all the Arlington applications" and "perform the same function" as Arlington's products. A2630:10-11; A2626:4-28:4.

Bridgeport's web site cross-referenced the Accused Connectors with Arlington's patented products (A2684:12-24; A2290:12-91:20; 2683:13-23), informing users that they are interchangeable. A2643:15-44:4. Additionally, Bridgeport used catalog numbers (38ASP and 380SP) similar to Arlington's (38AST and 380ST), which Mr. Suzio admitted was "not a coincidence" but rather "an intentional decision on Bridgeport's part to change [the] catalog numbers to be more identifiable with Arlington's product." A332:20-33:9.

Bridgeport's marketing materials are powerful visual evidence that Bridgeport traded on their products' equivalence to Arlington's patented features. *See Merial*, 681 F.3d at 1301 (the defendant "explicitly traded on the...equivalence" between the accused product and patented embodiment). And if the Enjoined and Accused Connectors are equivalent with the patented products, performing the method steps in substantially the same way to achieve substantially the same result, they are equivalent to each other. A4255-62.

This advertisement for the Enjoined Connectors highlights the "two snap" functionality of Arlington's invention: the electrical cable can "snap into the connector" (using the spring steel locking ring of limitation 4) and the connector "snaps into" the junction box (using the spring steel adapter of limitation 3):



A3956. And the Accused Connectors are advertised nearly identically ("snap the cable into the connector;" "snap the assembly into...the electrical box."):



A3966-68. And the same for the Connector's specification sheets:





Simply push 14/2 to 10/3 AC/MC or 3/8"
flexible metal conduit into the connector
push connector into 1/2" knockout.

Push cable or conduit into the
connector and snap the
connector into the box.

A3954                                          A3959

And both connectors have the same result of snapping into a junction box:

 

A3939; A3940; A3945.

Nowhere in any of Bridgeport' marketing are the alleged significant features cited in its brief: "greater tolerance for misalignment," "inserted at any angle," "leverage…to attach the connector," or "more secure and long-term electrical contact." BBr.39-47.

This evidence further supports the court's finding that the Accused Connectors are colorable imitations. A17-19.

### E.     Bridgeport's "Patents" are Irrelevant.

Bridgeport claims that it "has obtained twelve patents" on some electrical connector design. BBr.11  But, whether Bridgeport's products are separately patentable is not a defense to colorable imitation (which uses the same test as doctrine of equivalents; *see KSM*, 776 F.2d at 1527), or infringement.  *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1324 (Fed. Cir. 2000) ("separate patentability does not avoid equivalency as a matter of law."); *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1191 (Fed. Cir. 1996) (an accused device does not avoid infringement merely because it is patented).

Moreover, notwithstanding almost ten years of litigation between the parties, Bridgeport has never established that the Accused Connectors practice any claims in Bridgeport's patents.  In fact, Bridgeport's claim that Williamson "opined that these patents cover the [Accused Connectors]" (BBr.58) is simply unsupported by the record.  The alleged opinion cited by Bridgeport (A407¶30) consists of a single sentence with no explanation as to how the Accused Connectors are covered by the claims.  And because Bridgeport failed to disclose an expert opinion on this supposed defense before the hearing, in violation of Fed. R. Civ. P 26, the court shut down this line of questioning, ruling: "there's no patent defense here." A2790:19-95:22; 2797:24-25.

*************************************************************

Because Arlington presented significant record evidence that the Accused Connectors are colorable imitations with respect to limitations 2 and 3 of claim 1 of the '488 Patent, the court did not clearly err in its decision.

## IV. The Court Correctly Construed the Claims

The court's claim construction followed *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)(en banc). The court gave the terms at issue their ordinary and customary meaning that one of ordinary skill in the art at the time of the invention would have understood in light of the claim itself and the specification. *Id.* at 1313. Moreover, the court recognized that Bridgeport's construction would exclude preferred embodiments, which "is rarely, if ever, correct." *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1371 (Fed. Cir. 2010).

### A. "Cylindrical"

The second limitation of claim 1 requires a member having a "leading end with an external *cylindrical* surface." A41(9:30-32)(emphasis added). The court correctly construed "cylindrical" to mean "having the approximate form of a cylinder" (A23) rather than "an elongated body that has a circular cross-section which remains constant along the body's axial length," as Bridgeport proposed. BBr.59-69. Only the court's construction is consistent with (1) the term's ordinary meaning; (2) the specification; and (3) Bridgeport's previous admission of infringement. It should be affirmed.

58

### 1.    The Ordinary Meaning of "Cylindrical" Is Not Limited to a Perfect Cylinder

The ordinary meaning of "cylindrical" is "having the approximate form of a cylinder." A20-21; A141-42; A2264:16-73:5. Nothing in claim 1 supports Bridgeport's restrictive construction of "an elongated body that has a circular cross-section which remains constant along the body's axial length," which effectively rewrites "cylindrical" as "cylinder." BBr.59-69.

The claim does not refer to a "cross-section," much less a constant one. A41(9:27-10:12). Nor does it mention the surface's "axial length." *Id.* While the claim also requires a "spring steel adapter *surrounding said leading end external cylindrical surface*" (A41(10:1-3)(emphasis added)), there is similarly nothing about the "surrounding" adapter that requires either it or the "cylindrical surface" to have a constant cross-section. *Id.* Rather, the "cylindrical surface" need only be able to accommodate the "surrounding" adapter. A40(33-38); A2266:20-67:7. The court properly rejected Bridgeport's overly restrictive construction in favor of the ordinary meaning.

The definition of "cylindrical" in Webster's Dictionary further supports the court's construction. A21; *Phillips*, 415 F.3d at 1322-23 (court may "rely on dictionary definitions," if they do not contradict any definition found in the patent documents). Bridgeport argues that the "ordinary meaning of 'cylindrical' is exactly what Webster's says it is – 'having the form of a cylinder.'" BBr. 64. But

Webster's actually defines "cylindrical" as "*relating to or* having the form or properties of a cylinder." A142 (quoting *Webster's Third International Dictionary* (1993)); A21. In other words, "cylindrical" encompasses not only cylinders, but also forms "relating to" cylinders. Bridgeport's construction ignores this distinction.

Bridgeport further contends that the inventor's use of terms like "approximately" or "generally" to describe other features of the connector or spring locking ring weighs against the court's construction. BBr.65-66. But the specification does not reveal a special definition or intentional disclaimer of "cylindrical" that would exclude approximate forms of a cylinder. *Phillips*, 415 F.3d at 1317. Rather, the specification supports the court's construction. Under the ordinary meaning, which means "having the approximate form of a cylinder," writing the claim as "approximately cylindrical" would have been redundant.

## 2. The Specification Supports the District Court's Construction and Contradicts Bridgeport's

Like the claim itself, the specification never refers to a surface consisting of a perfect cylinder with constant axial cross-sections. Instead, "the specification and accompanying embodiments"—including embodiments that "portray an external cylindrical surface...that has varying cross-sections along its axial length"—demonstrate that "cylindrical" is "not the equivalent of a perfect

cylinder," and support the meaning of "having the approximate form of a cylinder." A22-23.[4]



As shown in annotated Figure 15 (above), the seat 132, with boundaries defined by "the lip 138 and central flange 130," depicts the claimed leading end external cylindrical surface.  A36(Fig.15); A40(7:33-38); A139.  It contains a raised portion and therefore does not have a constant cross-section along its axial length.  *Id.*  Annotated Figure 6 (below) further discloses corners rounded inward

---

[4] Bridgeport seeks to support its proposed construction with the opinion of Mr. Herbst.  BBr.66(citing A464-65).  But by his own admission Mr. Herbst is neither an expert nor one of ordinary skill in the field of electrical connectors (A2435:2-8; A2443:13-45:3) and therefore unqualified to testify regarding claim construction (or colorable imitation). *See* A3346-63; *Sundance v. DeMonte Fabricating*, 550 F.3d 1356, 1363 (Fed. Cir. 2008)(it is "contradictory to Rule 702" to permit a witness unqualified in the relevant art to testify regarding issues requiring consideration from the perspective of one of ordinary skill in that art).  Moreover, extrinsic evidence may not contradict intrinsic evidence in construing claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995).

.

and outward at the edges of the seat's raised portion, which result in additional variations in diameter (28). A1080-81.



A34(Fig.6); A39(6:1-5); A1081. Other figures depict the leading end cylindrical surface similarly. A32-36(Figs. 2, 7, 16, 19, 20); A1080-82. These "embodiments do not meet Bridgeport's proposed construction, and claim interpretation that excludes a patentee's preferred embodiment is rarely the correct interpretation." A23(citing *Funai*, 616 F.3d at 371).

Bridgeport concedes that the cylindrical surface annotated in blue in the embodiments above has varying diameters. BBr.66 (describing it as consisting of "straight-sided cylinders of *different diameters*")(emphasis added). But Bridgeport tries to treat that single surface in fragments by arguing that, although the specification states that the flange and lip "define the boundaries" of *the surface* in those embodiments, this does not mean the surface "adjoin[s] the flange and lip." BBr.61. This argument is contradicted by the '488 Patent, which refers to the entire surface as a single cylindrical surface, including one embodiment that

plainly states that "*[t]he* smooth cylindrical section has flanges *at each end* defining to hold the spring steel adaptor in place." A41(9:4-8)(emphasis added). This surface is intended to accommodate a spring steel adapter. A37(2:38-41). And that adapter, which is claimed to "surround said leading end cylindrical surface" (A37(2:38-41)), is likewise depicted as "surrounding" the entire area, and not only a fragment of the surface:



A3994(Fig.22)(annotated; orange indicates adapter).

Thus, the court did not violate the "indefinite article rule" as Bridgeport claims (BBr. 60-62), when it identified the entire surface in front of the flange—but excluding the lip—as the external surface in both the '488 Patent embodiments and on the Enjoined Connectors, in accordance with the written description. A9-17. While it is true that the use of "'a' or 'an' *can* mean 'one or more'" (*Baldwin Graphic Sys. v. Siebert*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (emphasis added)), that rule does not apply when the specification "shows that the term was used in its

singular sense." *Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1359 (Fed. Cir. 2005). Thus, the indefinite article "a" or "an" should not be construed as "one or more" when "the context clearly evidences that the usage is limited to the singular." *TiVo v. Echostar Commc'ns*, 516 F.3d 1290, 1303 (Fed. Cir. 2008).

Such is the case here, where the '488 Patent claims and specification consistently refer to a singular leading end, having a single external surface that is required to be cylindrical, and that is to be surrounded by a single adapter. A9-10. Even Dr. Williamson admitted that the "patent never discusses the fact there could be numerous cylindrical sections" but only talks "about one." A2854:6-9. Nor did the court err by determining which portion of the Enjoined and Accused Connectors corresponds to that feature as part of its colorable imitation analysis (BBr.60), as required by *TiVo*. A9-10; *TiVo*, 646 F.3d at 882 (requiring comparison of "the features relied upon to establish infringement and the modified features of the newly accused products").

Notably, the "indefinite article rule" discussed in *Baldwin* (BBr.60) is intended to provide Arlington with the broader claim coverage of "one or more" cylindrical surfaces. Yet it is Bridgeport, the defendant in a contempt proceeding, claiming this rule supports its latest inconsistent theory (A9-10) as to what constitutes the infringing cylindrical surface on the Enjoined and Accused Connectors. It also attempts to use the rule to contradict the '488 Patent disclosure

64

of cylindrical surfaces with varying diameters by claiming the "seat 132" depicts multiple cylindrical surfaces. A10. Although both the Enjoined and Accused Connectors would continue to infringe under a "one or more" surface construction, Bridgeport misapplies the rule in an attempt to discredit the overwhelming evidence establishing its contempt. This is nothing more than a convoluted attempt to justify its expert's inconsistent colorable imitation analysis of only a portion of the Enjoined Connectors' leading end cylindrical surface. (A9-10; 17 n.8)

Bridgeport's proposed construction should be rejected because it is contradicted by the claims and specification and excludes disclosed embodiments from its scope. *Funai*, 616 F.3d at 1371. By contrast, the court's construction is supported by the '488 Patent and accounts for the Patent's disclosure of a "cylindrical" surface having varying cross sections, and should be affirmed.

### 3. The District Court's Construction Is Consistent with Bridgeport's Previous Admission of Infringement

In a contempt proceeding, infringement by the previously-enjoined device is "not open to challenge." *Additive Controls*, 154 F.3d at 1350; *Merial*, 681 F.3d at 1300. Accordingly, the court held that "any claim construction in this matter must be faithful to Bridgeport's admission that the Enjoined Connectors infringed the '488 Patent and thus met each limitation." A20. And here, Bridgeport's previous admission of infringement lends further support for the court's construction of "cylindrical." Its admission "necessarily and conclusively established" that the

Enjoined Connectors meet the "external cylindrical surface" limitation.  681 F.3d 1283 at 1300.

Like the '488 Patent embodiments, the Enjoined Connectors' "external cylindrical surface" has varying cross-sections along its length.  A2268:15-69:14; A2210:2-11:20;   A2213:4-16;   A2217:5-18:20;   A1063-65;   A1194;   A1196. Bridgeport's engineering drawings show rounded corners, fillets, drafted (or angled) sides, and raised ridges along the cylindrical surface (in blue, below):



*Id.*

Contrary to its current argument that the Enjoined Connectors "had three external surfaces" rather than one, BBr.52-53, Bridgeport admitted in the proceeding below that the entire area identified in blue above constitutes the claimed "cylindrical surface."  A347 ("A cross-section taken along the axis of the [Enjoined] Connectors clearly shows that *the three cylinders that compose the*

'cylindrical surface' all have straight, parallel sides.") (emphasis added).[5] Dr. Williamson likewise left no room for ambiguity when he stated that "three cylinders...compose the 'cylindrical surface' on the old design." A408.

Further, Dr. Williamson admitted that Bridgeport's construction would be inconsistent with its admission of infringement. A1308:16-24. Adopting Bridgeport's construction would therefore constitute a collateral attack on its prior admission of infringement, and infringement by the Enjoined Connectors is "not open to challenge in contempt proceedings." 681 F.3d at 1300.

### 4. The Court Did Not Base Its Construction on Its Previous Construction of the '831 Patent

The court explicitly stated that its construction of "cylindrical" is "based on the '488 Patent specification and accompanying embodiments" (A22) and did not base its construction on its previous construction of that term in Arlington's '831 patent, as Bridgeport asserts (BBr.68-69). The court merely summarized, but did not adopt, Arlington's argument that the construction of "cylindrical outbound

---

[5] The district court noted Bridgeport's constantly changing positions (A9) and was in the best place to make a credibility determination. Dr. Williamson at one point even argued that *only* the recessed area on the Enjoined Connectors, and not the raised areas, constitutes a "cylindrical surface" (A2864:4-4), despite the raised areas being the only portion on which the adapter seats (A2853:13-18) and contradicting his previous admission and Bridgeport's current position on appeal.

end" in claim 1 of the '831 Patent supports the construction of "cylindrical" here. A21.

Had the court relied upon the previous construction, it would have been justified to do so. The '831 and '488 Patents share the same inventor and disclosure and relate to the same technology. The inventor's use of "cylindrical" in the '831 Patent to describe the entire "outbound end," which includes the lip and the flange (BBr.69) demonstrates that when the inventor uses the word "cylindrical," he is not referring to a surface having "a circular cross-section which remains constant along the body's axial length." A21; A111-12; A142-43. The term clearly "encompasses something other than a cylinder." A111; A23.

### 5. The District Court's Construction Does Not Render Other Claim Terms Superfluous

Claim 2 contains a "generally cylindrical" limitation, which refers to a wholly separate feature of the invention—the spring steel locking ring inserted into the trailing end of the connector, not the leading end of the zinc die cast connector referred to in claim 1. A41(10:13-18). Bridgeport contends that the court's construction of "cylindrical" connector renders superfluous the term "generally," as used in the "generally cylindrical" spring locking ring limitation of claim 2. BBr.65-66.

That is not so. First, there is no claim differentiation because the limitation of claim 2 relates to a different feature of the invention. Second, the word

"generally" in the claim term "generally cylindrical" accounts for a variety of deviations—plainly depicted in the patent—from the "approximate form of a cylinder" in the overarching shape of the locking ring.   A1083; A2396:5-98:17; A3120:21-23:3.   The specification depicts various embodiments of the "generally cylindrical spring steel locking ring," each one having tangs protruding inward and outward:



**A35(Fig.12)**          **A33(Fig.5)**          **A35(Fig.10)**



**A33(Fig.3)**          **A35(Fig.14)**

A39(5:2-14 ("Generally cylindrical spring steel locking ring 20...has a first set of tangs 36 and 36A..."). These protrusions are easily viewed in Arlington's commercial embodiment:







A3942

(view of locking ring inserted in trailing end of connector)

(view of locking ring removed from trailing end)

Because the phrase "generally cylindrical" accounts for these deviations from the "approximate form of a cylinder," there is nothing superfluous about the term "generally" in "generally cylindrical" under the court's construction of "cylindrical." A1083; A2396:5-98:17; A3120:21-23:3.

Bridgeport gains no support by citing to unrelated claim constructions, of unrelated terms, in unrelated patents, of unrelated inventors, discussing unrelated technologies. BBr.66-68; *see Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167 (Fed. Cir. 2004)("an unrelated patent 'sheds no light' on the claims in the patent at

issue"); *Medrad*, 401 F.3d at 1318-19.[6]  Bridgeport cannot escape the '488 Patent

specification, which is "the single best guide to the meaning" of "cylindrical," and

formed the basis for the court's construction.  *Phillips*, 415 F.3d at 1313; A22-23.

## B.  "Surrounding"

The third limitation of claim 1 requires a "spring steel adapter *surrounding*

said leading end external cylindrical surface."  A23(citing A41(10:1-3)).  The court

correctly construed "surrounding" to mean that the adapter "significantly borders"

the leading end of the connector's external cylindrical surface.  A23.  This

construction was established in prior litigation concerning a related patent.  A115-

16; A149; *see Arlington*, 290 F. Supp. 2d at 508.  It is also consistent with the

intrinsic evidence, A23-24, and should be affirmed.

## 1.  The Previous Construction of "Cylindrical" Has Preclusive Effect

Four elements are necessary for collateral estoppel.  *Peloro v. United States*,

488 F.3d 163, 175 (3d Cir. 2007).  There can be no dispute as to three of those

---

[6] In addition to being irrelevant, the cases Bridgeport cites are also distinguishable. BBr.66-68.  *Int'l Rectifier* is a pre-*Phillips* case that put undue weight on the dictionary definition of the disputed term.  361 F.3d at 1369-71.  *Anchor Wall* also utilized the pre-*Phillips* standard and is additionally unhelpful because the parties agreed on the meaning of "parallel" in the disputed limitation "generally parallel." 340 F.3d at 1310-11.  *Stumbo* does not address words of approximation.  508 F.3d at 1362-63.

elements here: the 0485 Action "actually litigated" the construction of "surrounding"; the construction was "determined by a final and valid judgment"; and the construction was "essential to the prior judgment." *Id.* The fourth element addresses whether the claim construction "sought to be precluded" is "the same as that involved in the prior action." *Id.* It is.

In the '0485 Action, Judge Conner construed the term "surrounding" in claim 8 of the '050 Patent to mean "significantly border[ing]." 290 F. Supp. 2d at 521-22. Based in part on that construction, the court entered a final judgment of infringement against the Accused Connectors, which this Court affirmed in 2012. Although this case involves a different patent, collateral estoppel nevertheless "applies to common issues in actions involving different but related patents." *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 252 F.3d 1306, 1310-11 (Fed. Cir. 2001). And "[t]he same claim term" in "related patents carries the same construed meaning." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003).

Claim 8 of the '050 Patent and claim 1 of the '488 Patent both use the term "surrounding," and do so in nearly identical fashion:

| '050 Patent | '488 Patent |
|---|---|
| "a circular spring metal adaptor *surrounding said leading end* of said electrical connector..." | "...a spring steel adapter *surrounding said leading end external cylindrical surface*..." |
| A4461(10:35-38)(emphasis added). | A41(10:1-3)(emphasis added). |

Because the "external cylindrical surface" is a subset of the "leading end," both Patents effectively require the adapter to "surround" the "external cylindrical surface." A1088.

The '050 and '488 Patents are also closely related. The '488 Patent incorporates the '106 Patent in its entirety by reference to describe the spring steel adapter. A38(4:6-10). By its incorporation into the '488 Patent, the '106 Patent "becomes effectively part of the ['488 Patent] as if it were explicitly contained therein." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001). The '106 Patent is a sibling of the '050 Patent (A1088; A24), as depicted below:



The disclosures of the '050, '106, and '488 Patents are identical in describing how the adapter "surrounds" the connector. The '488 Patent's disclosure therefore contains the same figures and embodiments disclosing an adapter that were before the court in the 0485 Action when it construed "surrounding" to mean "significantly borders." *Compare* A4450(Figs. 2, 5, 12) *with* A3986-91(Figs. 2, 5, 12.).

Accordingly, that construction has preclusive effect. *Mycogen*, 252 F.3d at 1310-11 (collateral estoppel "applies to common issues in actions involving different but related patents"). At a minimum, the court was correct to construe "surrounding" consistently with the construction in the 0485 Action. A24.

## 2. The Intrinsic Evidence Supports the District Court's Construction and Contradicts Bridgeport's

The '488 Patent identifies the "spring steel adapter 14" as an embodiment of the claimed adapter "surrounding" the cylindrical surface. A147(citing A38(4:5)). But nothing in the intrinsic record restricts "surrounding" to "require that the adapter be *entirely* on the outside of the cylindrical surface," as Bridgeport urges. BBr.71(emphasis added). Instead, both the claim and the specification make clear that the adapter need only "significantly border" the cylindrical surface, which is how the court construed the term.

The claim itself does not require that the adapter "completely" or "entirely" "surround" the cylindrical surface—merely that it "surround." A41(10:1-3). The same is true of the specification, which incorporates by reference the '106 Patent to describe the adapter. *See* A147(citing A38(4:6-10). And the '106 Patent does not remotely limit "surrounding" to require that the adapter "be entirely on the outside of the cylindrical surface." Rather, it discloses adapters where part of the underlying leading end, including the cylindrical surface, is exposed through a gap and cannot be completely enclosed by the adapter:



**A3993(Fig.20)**          **A3994(Fig.22)**          **A3986(Fig.2)**

(annotated, orange indicates adapter)

*See also* A3988(Fig.5); A31(Fig.1).

Moreover, unlike claim 1 of the '488 Patent, which requires that only the "cylindrical surface" be "surrounded" by the adapter, the claims of the '106 Patent require the adapter to "surround" the *entire leading end* of the connector, which comprises the entire portion of the connector that is inserted into the junction box, including the "lip" (76) at the front end. *Compare* A4004(13:7-11) *with* A41(10:1-3). Yet, as can be clearly seen in Figure 22 of the '106 Patent, the lip at the front of the connector (element 76, below) "extends outside the adapter" and the adapter (orange) is therefore not "entirely on the outside" of the leading end:

76



**A3994(Fig. 22)**

Bridgeport never discusses the '106 Patent disclosure (BBr.69-71), and with good reason: Bridgeport's construction of "surrounding" would exclude each embodiment above from the scope of both the '488 and '106 Patent claims. That result contradicts basic principles of claim construction. *See Funai*, 616 F.3d at 1371. By contrast, the court's construction, "significantly bordering," is consistent with these disclosures and should be affirmed.[7]

## V.   The Findings of Direct and Indirect Infringement Should Be Affirmed

The court expressly analyzed claim construction and infringement independently of colorable imitation (A9-20; A20-25; A25-28) and did not "conflate[] infringement into colorable imitation" with regard to the "cylindrical"

---

[7] The Accused Connectors meet the "surrounding" limitation even under Bridgeport's erroneous construction since the lip or "lugs" on the Accused Connectors are not part of the "cylindrical surface."

limitation.  BBr.72.[8]  Arlington demonstrated "by clear and convincing evidence
that the Accused Connectors have leading end external surfaces that have the
approximate form of a cylinder."  A25.  Dr. Rahn provided "both visual and
quantitative" analyses in support of this finding.  A25; A143-44; A183; A191;
A198; A1092-96; A1184; A1194-97; A2281:23-2286:8; A3139:2-3141:2.  He
testified that Accused Connectors' leading end surface tapers a mere forty-
thousandths-of-an-inch, meaning it has the approximate form of a cylinder.
A2283:10-2285:8; A3139:2-3140:9.  He further demonstrated that the surface
deviates from a perfect cylinder by only 3-4% using a standard deviation
methodology, or by a mere 5.54% using Dr. Williamson's methodology.  A1194;
A1196; A2285:9-2286:8.  Dr. Rahn therefore opined that the surface has "the
approximate form of a cylinder" and meets the "cylindrical" limitation.  A2283:10-
20; A3139:2-9.  And neither Dr. Rahn nor the court erred in confirming this fact by
comparing this deviation from a cylinder to that of the Enjoined Connectors (5%
using Dr. Rahn's method, 5.46% using Dr. Williamson's), which were admitted to
be infringing and therefore established as a matter of law as having met the
"cylindrical" limitation.  A25; A2281:23-2286:8; A3139:2-3141:2; A2217:5-

_____

[8] Bridgeport does not allege any error in the court's finding that the Accused
Connectors meet the "surrounding" limitation, as construed.  BBr.71-72.

A2219:5; A2220:3-2221:8; *see Merial*, 681 F.3d at 1301 (finding no error in comparing newly accused product to a product known to be covered by the asserted claims as part of infringement determination); *Brine, Inc. v. STX, L.L.C.*, 367 F. Supp. 2d 61, 68 (D. Mass.)(predicating infringement finding in part on insignificant differences in measurements between enjoined and accused product), *aff'd*, 139 Fed. Appx. 281 (Fed. Cir. 2005).

In addition to direct infringement, Bridgeport was also found liable for induced infringement. A26-27. With regard to induced infringement, Bridgeport claims that Arlington failed to provide direct evidence of underlying direct infringement by Bridgeport's customers. BBr.72.[9] But "it is hornbook law" that circumstantial evidence is sufficient. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318-19 (Fed. Cir. 2009). Arlington presented evidence of significant sales of the Accused Connectors, A1054; A1240; A2301:1-10, combined with Bridgeport's instructions to use the Accused Connectors in an infringing manner in its marketing materials. A26-27; A154-55; A1136-37; A2288:18-2302:3; A3968; A3969. This Court has held just such evidence sufficient to establish infringement.

---

[9] Bridgeport does not dispute that Arlington presented evidence that Bridgeport itself is a direct infringer. A26; *see* BBr.71-72, 74. Arlington proved that Bridgeport uses the Accused Connectors in promotional videos to perform each step of the claimed method. A26; A153; A1135; A2288:18-90:1; A3968; A3969.

S*ee Lucent*, 580 F.3d at 1317-19 (finding evidence of sales of the accused product, combined with instructions teaching the infringing use sufficient); *Chiuminatta Concrete Concepts v. Cardinal Indus.*, 145 F.3d 1303, 1312 (Fed. Cir. 1998) (finding evidence of advertisements conceding ability of the accused device to practice the claimed method and encouraging such use sufficient).

Finally, Bridgeport complains that the court limited Bridgeport's non-infringement arguments to limitations two and three of claim 1. BBr.72. But the court was correct to do so, *see* A1770-73, as it was only "required to evaluate the *modified elements* of the newly accused product against the asserted claim." *TiVo*, 646 F.3d at 883 (emphasis added). The logic behind this rule is simple: a "contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." A1771 (quoting *TiVo*, 646 F.3d at 889).[10] Because the only differences that Bridgeport identified since the original action involving the

---

[10] The court did not "convert a method patent into an apparatus patent" by following these tenets of *TiVo*. BBr.72. *TiVo*'s admonishment that only modified elements are to be considered in a contempt proceeding applies equally to a method patent, which was at issue in *TiVo*. *See* 648 F.3d 869. In any event, Bridgeport's non-infringing-use argument concerns the scope of the injunction, which is not open to challenge.

Enjoined Connectors "implicate[d] limitations two and three," the court was correct to limit the contempt hearing to those two limitations. A1772.

The findings of infringement should be affirmed.[11]

## VI. Bridgeport's Challenge to the Scope of the Injunction Is Misplaced and Its Argument Regarding Lost Profits Demonstrates the Prematurity of This Appeal

In 2004, Bridgeport entered into a settlement agreement with Arlington and admitted that its Enjoined Connectors infringe the '488 Patent. A88. Bridgeport also agreed to the '488 Injunction. A64. Now, nine years after bargaining for and stipulating to that injunction's terms, Bridgeport attempts to challenge its scope on the theory that the injunction allegedly treats the '488 Patent as a "product patent" by prohibiting Bridgeport from "selling" the Accused Connectors and allegedly enjoining some non-infringing conduct. BBr.73-74.

But the scope of the injunction entered by the court is identical to the scope of the injunction stipulated to by Bridgeport in 2004 (*compare* A64 *with* A29-30), and the law is clear that the time "to appeal the scope of an injunction is when it is handed down, not when a party is later found to be in contempt." *TiVo*, 646 F.3d

_____

[11] Bridgeport incorrectly claims that if any of the court's constructions are reversed, the Accused Connectors do not infringe claim 1. BBr.71. Even under Bridgeport's proposed constructions, the Accused Connectors infringe. A145-46; A1098-1103.

at 889.   The injunction and "its alleged infirmities cannot be relitigated or corrected in a subsequent contempt proceeding." *Id.* This is true even if the injunction may have the potential to enjoin some non-infringing conduct. *See TiVo*, 646 F.3d at 889.   Bridgeport is therefore prohibited from challenging the scope of the injunction.

Separately, Bridgeport's challenge to the injunction's scope lacks merit. Bridgeport's newly raised and untimely argument that its customers might use the Accused Connectors in a "non-infringing" manner (BBr.74) is without merit. Bridgeport presented no evidence of such non-infringing use at the hearing and Arlington's evidence that Bridgeport's customers directly infringe (A26-27), was therefore uncontroverted. *See* A2818:20-A2819:6, A26-27.[12]

Finally, although Arlington has acknowledged that it is not presently entitled to *double* lost profits, A73, it maintains that it is entitled to sanctions in the form of lost profits and attorneys' fees.   But Bridgeport's request that the court's "award" be vacated illustrates the frivolity of—and lack of jurisdiction for—Bridgeport's

---

[12] Bridgeport raised its purported non-infringing-use argument for the first time in a declaration months after the hearing, depriving Arlington of the opportunity to cross-examine the declarant.  BBr.74(citing A3640-43).

appeal: the proceeding below has not yet concluded, and thus, there is no sanctions award to vacate. *See* A27 n.18.

## CONCLUSION

For all of the foregoing reasons, Arlington respectfully requests that this Court affirm the district court's March 19, 2013 contempt order.

October 28, 2013                                   Respectfully submitted,


/s/ Kathryn L. Clune
KATHRYN L. CLUNE
COUNSEL OF RECORD
AMIR D. KATZ
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2500 (Telephone)
(202) 628-5116 (Facsimile)
kclune@crowell.com
akatz@crowell.com

JACOB Z. ZAMBRZYCKI
CROWELL & MORING LLP
275 Battery St.
23rd Floor
San Francisco, CA 94111
(415) 986-2800 (Telephone)
(415) 986-2827 (Facsimile)
jzambrzycki@crowell.com

CARTER G. PHILLIPS
RACHEL H. TOWNSEND
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000 (Telephone)

(202) 736-8711 (Facsimile)
cphillips@sidley.com
rtownsend@sidley.com

*Counsel for Plaintiff-Appellee*
*Arlington Industries, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

Pursuant to Federal Rules of Appellate Procedure 25(b) and (d), I hereby certify that on this 28th day of October, 2013, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF System and caused a true and correct copy to be sent via e-mail to:

Alan M. Anderson, Esq.
Aaron C. Nyquist, Esq.
Matthew R. Palen, Esq.
Alan Anderson Law Firm LLC
Crescent Ridge Corporate Center
11100 Wayzata Blvd., Suite 545
Minneapolis, MN 55305
(612) 756-7000 (Telephone)
(612) 756-7050 (Facsimile)
aanderson@anderson-lawfirm.com
anyquist@anderson-lawfirm.com
mattpalen@comcast.net

    /s/ Kathryn L. Clune
Kathryn L. Clune
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 624-2705 (Telephone)
(202) 628-5116 (Facsimile)
kclune@crowell.com

## **CERTIFICATE OF COMPLIANCE**

I certify that the foregoing Brief of Plaintiff-Appellee Arlington Industries, Inc. complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A)(i) and contains 13,931 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point.


Dated: October 28, 2013

       /s/ Kathryn L. Clune
Kathryn L. Clune
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2705 (Telephone)
(202) 628-5116 (Facsimile)
kclune@crowell.com